UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JACQUELINE I. RODRIGUEZ,

Plaintiff,

- versus -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

MEMORANDUM
AND ORDER
12-CV-4103

APPEARANCES

> HERBERT S. FORSMITH
> 26 Broadway, 17th Floor
> New York, New York 10044
> *Attorney for Plaintiff*

> LORETTA E. LYNCH
> United States Attorney
> Eastern District of New York
> 271 Cadman Plaza East
> Brooklyn, New York 11201
> By: Candace Scott Appleton
> *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

Jacqueline Rodriguez seeks review, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), of the Commissioner of Social Security's denial of her application for Social

Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").  The parties

have cross-moved for judgment on the pleadings; the Commissioner seeks a judgment upholding

his determination and Rodriguez seeks a remand for further proceedings.  I heard oral argument

on March 28, 2013.  Because the Commissioner's decision is not supported by substantial

evidence in the record, I deny his motion.  Rodriguez's cross-motion is granted, and the case is remanded to the Commissioner for further proceedings as detailed below.

BACKGROUND

A.     *Procedural History*

Rodriguez applied for SSDI and SSI on April 26, 2009, claiming disability as of March 9, 2009.[1]  R. 86-90.  The Commissioner denied her applications on June 23, 2009.  R. 36-41.  Rodriguez then requested and receiving a hearing before Administrative Law Judge ("ALJ") Michael Friedman on January 19, 2011.  R. 59.  Rodriguez, who was represented by counsel, testified at the hearing.  R. 20-31.  No medical or vocational expert testified at the hearing.  *Id*. On February 4, 2011 ALJ Friedman found that Rodriguez was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity ("RFC") to perform a full range of sedentary work, which left her unable to perform her past relevant work as a cashier but able to perform jobs existing in significant numbers in the national economy in light of her age, education, and work experience.  R. 10-12.  The Appeals Council denied Rodriguez's request for review on June 1, 2012, R. 1-3, rendering the ALJ's adverse decision the final decision of the Commissioner, *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

---

1       The record indicates two protective filing dates for Rodriguez's application for SSDI.  Rodriguez's application summary for SSDI indicates a protective filing date of April 22, 2009, R. 89, while her disability determination indicates a protective filing date of February 26, 2009, R. 33.  The decision of Administrative Law Judge ("ALJ") Michael Friedman relies on the latter date.  R. 7 ("On February 26, 2009, the claimant protectively filed a Title II application for a period of disability and disability insurance benefits").  However, since both parties represent the protecting filing date as April 26, 2009, I will rely on that date instead.  Def.'s Mem. Support Mot. J. Pleadings 3, ECF No. 17 ("Plaintiff filed applications for disability insurance benefits and SSI, which were given protective filing dates of April 22, 2009."); Pl's Mem. Support Mot. J. Pleadings 2, ECF No. 21 ("On April 22, 2009, the claimant protectively filed applications for disability and Supplemental Security Income.").

B.      *Rodriguez's Description of Her Medical Condition*

Rodriguez was born in 1962.  R. 86, 89.  She has a high school education.  R. 109, 118.  She worked as a cashier for a number of retail businesses from 1979 until 2009.  R. 106, 115, 121, 140-45.  In this role, she was required to stand for five to six hours a day.  R. 106, 116, 122, 141-45.  She was also required to lift and carry objects weighing less than ten pounds throughout the day.  R. 106, 116, 122, 141-45.  She stopped working on March 9, 2009 due to the alleged onset of her disability.  R. 105, 115.

In her application for benefits, Rodriguez indicated that she was 5'3" tall and weighed 260 pounds.  R. 104, 114.  She claimed she was limited in her ability to work due to herniated discs;[2] arthritis in her lower back, knees, and legs;[3] diabetes; and high cholesterol.  R. 105, 114.  She reported that these conditions rendered her unable to sit for longer than ten minutes, stand for longer than five minutes, and lift more than five pounds.  R. 105, 114.  She also reported an inability to walk long distances, bend over, or crouch, and difficulty sleeping.  R. 105, 114.  She indicated that she takes Crestor,[4] Detrol,[5] Glucovance,[6] and Hydrocodone.[7]  R.

---

[2]      "The bones (vertebrae) that form the spine in your back are cushioned by small, spongy discs. When these discs are healthy, they act as shock absorbers for the spine and keep the spine flexible.  But when a disc is damaged, it may bulge or break open.  This is called a herniated disc.  It may also be called a slipped or ruptured disc."  *Herniated Disc – Topic Overview*, WEBMD, http://www.webmd.com/back-pain/tc/herniated-disc-topic-overview.

[3]      Arthritis is the inflammation of one or more joints.  *Arthritis*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002223/.

[4]      Crestor reduces levels of "bad" cholesterol (i.e. low-density lipoprotein) and triglycerides in the blood, while increasing levels of "good" cholesterol (i.e. high-density lipoprotein).  *Crestor (Rosuvastatin)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-rosuvastatin/article_em.htm.

[5]      Detrol reduces spasms of the bladder muscles and is used to treat overactive bladder.  *Detrol, Detrol LA (Tolterodine)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-tolterodine/article_em.htm.

[6]      Glucovance is a combination of two oral diabetes medicines that help control blood sugar levels.  *Glucovance (Glyburide and Metformin)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-glyburide_and_metformin/article_em.htm.  Rodriguez indicated that she took both Glucovance and Metformin, but Glucovance combines two diabetes medicines, one of which is Metformin.

[7]      Hydrocodone is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to severe pain.  *Hydrocodone*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

109, 118.  She reported that she experiences nausea as a side effect of taking Metformin and

drowsiness as a side effect of taking Hydrocodone.[8]  R. 109, 118.

      In May 2009 Rodriguez also completed a "Function Report" and "Pain

Questionnaire" for the New York State Office of Temporary and Disability Assistance, the state

agency responsible for obtaining information in connection with her application for disability

benefits.  R. 128-39.  Rodriguez reported that she first began to experience pain in February 2009

and that the pain also began to affect her activities around this time.  R. 137.  She described the

pain as a "stabbing hard extreme pain" in her "left knee and behind the knee and the leg."  R.

137.  She indicated that this pain radiates to her "lower back and left leg, front leg, behind [her]

knee, and . . . left knee."  R. 137.  She further indicated that the pain has gotten worse since she

first experienced it and that it has extended "down the front of [her] leg, behind the knee, [her]

lower back."  R. 138.  She reported that she experiences the pain "all the time, everyday" and

that "walking and standing sometimes sitting" bring on the pain."  R. 138.  She indicated that she

takes Hydrocodone for the pain but answered "no" to the question "Does the medication relieve

the pain?"  R. 138.  She also indicated that the medication results in "vomit[ing], dizziness,

drowsiness."  R. 138.

      Rodriguez reported that the pain has limited her daily activities.  While she used

to be "able to walk a lot," now she is limited to walking "1/2 block and then . . . hav[ing] to rest."

R. 130.  She indicated needing assistance "most of the time doing chores, laundry, wash[ing]

dishes, throwing out garbage, cooking."  R. 132.  She reported shopping for groceries once to

twice a week, and that it takes between one to two hours.  R. 133.  She also reported visiting the

doctor every two to three weeks.  R. 134.  Although she reported preparing her own meals, she

indicated that she tries to make "something easy, so I don't have to stand on my feet too long"

---

    8      Metformin is one of two diabetes medicines that make up Glucovance.  *See* note 5.

and that she has "to sit down sometimes, then get up and continue cooking again." R. 131.  She

reported being unable to go out alone, as she fears that she "might fall or get hurt" and that her

"legs might give out." R. 132.  She spends most of the day "on the computer, talk[ing],

chat[ting]," whereas in the past her daily activities included "walking a lot, going places with

friends, doing a lot [of] chores, going to the mall." R. 136, 139.

        In her July 2009 request for review of the initial denial of benefits, Rodriguez

claimed that the pain in her back and knee had worsened since her initial applications.  R. 151.

She reported that when she got out of bed in the morning, or tried to stand, she "must hold on to

objects around her like a dresser or adj[ac]ent objects." R. 151.  She remained unable "to walk

for long periods of time[ ]," and had to "constantly hold on to her back." R. 151.  She indicated

that the pain had begun to increase in June 15, 2009.  Rodriguez also reported that the pain in her

lower back, herniated discs, and knee had "begun to travel to the . . . feet and toes," which

"suffer from sever[e] numbness," and that her ankles had begun to "swell." R. 151.  She

indicated that these symptoms appeared in July 2009.  R. 151.  She reported taking the same

medications as in her initial applications, as well as Lyrica[9] and Triamterene.[10]  R. 151.

        At the hearing on January 19, 2011, Rodriguez testified that she was 5'3" tall and

weighed 226 pounds, indicating that she had lost "about 30-40 pounds" in the last year.  R. 23-

24.  She testified that she experienced "pain and discomfort" in her lower back, where she had a

herniated disc, and "bad arthritis" in her left knee.  R. 23.  She indicated that she had "problems

walking" due to her lower back, and that a doctor had  prescribed a cane for her.  R. 23, 28.  She

also indicated that she "get[s] tired a lot" as a symptom of her diabetes.  R. 25.

---

        9       Lyrica is an anti-epileptic drug, which slows down impulses in the brain that cause seizures.
*Lyrica (Pregabalin)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-pregabalin/article_em.htm.
        10      Triamterene is a diuretic that prevents the body from absorbing too much salt and keeps potassium
levels from getting too low.  It is used to treat fluid retention (edema).  *Dyrenium (Triamterene)*,
EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-triamterene/article_em.htm.

Rodriguez testified that she stopped work on March 9, 2009 as a result of the pain in her lower back and knee.  R. 29.  Specifically, she reported that the pain resulted in her taking days off, and that her employer terminated her as a result.  R. 29.  She testified that in March 2009 the pain in her knee caused her to seek medical attention at Staten Island University Hospital.  R. 29.  She received an MRI at the hospital, which revealed problems with her knee. R. 29-30.

Rodriguez testified that physical therapy temporarily alleviates her pain, but as soon as she stops, the pain returns immediately.  R. 24.  She also indicated that medication helps "sometimes," but that the pain "comes right back."  R. 24.  Specifically, she testified that she takes Hydrocodone twice a day, but that it leaves her tired and drowsy, so that she tries not to take it during the day.  R. 27-28.  She reported taking Aleve during the day, which would provide "[a] little" relief.  R. 27-28.

Rodriguez testified that she can stand for five minutes before having to sit down, and that she can sit comfortably for five minutes before having to stand up.  R. 25.  She also indicated that she could lift about five pounds.  R. 25.  She reported difficulty with activities of daily living.  R. 28.  Specifically, she indicated that it takes her about "a half an hour to get dressed" and an inability to bend down to tie her shoes.  R. 29.  She also indicated that she has difficulty getting in and out of the bathtub and that she has "to go slowly."  R. 29.

Rodriguez testified that she goes grocery shopping, but that a neighbor or a friend will usually accompany her to assist.  R. 26.  She also reported doing "light cooking" and cleaning the home, but that she "get[s] tired at times" and "ha[s] to sit down and stop."  R. 26. She reported sitting and watching TV, but that when she "can't sit no[ ] more, . . . hav[ing] to get

up and walk around."  R. 26.  She also reported using the computer, but similarly having to "get up" when "sit[ting] down on the chair near the computer."  R. 26.

Rodriguez testified that she would be unable to work a job where she was sitting down during the day due to her herniated discs and knee.  R. 27.

C.    *The Medical Evidence*

1.    *2005-2009: Medical Evidence Prior to the Alleged Onset Date*

On March 2, 2005 Rodriguez visited her primary care physician, Dr. Shaikh Monirul Hasan, and complained of pain in her back.  R. 172.  Dr. Hasan prescribed Glucotrol,[11] Avapro,[12] enteric coated aspirin ("ECASA"),[13] Lotrisone cream,[14] and Griseofulvin.[15]  R. 173.  Dr. Hasan referred Rodriguez to an ophthalmologist and a podiatrist for her diabetes, a surgeon for her spider veins,[16] and a gynecologist for a routine exam.  R. 226-229.  He also ordered lumbar spine x-rays for her back pain.[17]  R. 224.  The x-rays were taken on March 18, 2005 and

---

11     Glucotrol is an oral diabetes medicine that helps control blood sugar levels and helps the pancreas produce insulin.  *GlipiZIDE XL, Glucotrol, Glucotrol XL (Glipizide)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-glipizide/article_em.htm.

12     Avapro keeps blood vessels from narrowing, which lowers blood pressure and improves blood flow.  It is used to treat high blood pressure (hypertension).  It is also used to treat kidney problems caused by type 2 diabetes.  *Avapro (Irbesartan)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-irbesartan/article_em.htm.

13     Enteric coated aspirin is used to relieve mild to moderate pain.  It is also used to reduce pain and swelling in conditions such as arthritis.  *Enteric Coated Aspirin Oral*, WEBMD, http://www.webmd.com/drugs/drug-21141-Enteric+Coated+Aspirin+Oral.aspx?drugid=21141&drugname=Enteric+Coated+Aspirin+Oral.

14     Lotrisone is used to treat various inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch.  *Lotrisone Top*, WEBMD, http://www.webmd.com/drugs/drug-15519-Lotrisone+Top.aspx?drugid=15519&drugname=Lotrisone+Top.

15     Griseofulvin is an antifungal antibiotic used to treat infections such as ringworm, athlete's foot, jock itch, and fungal infections of the scalp, fingernails, or toenails.  *Fulvicin P/G, Fulvicin U/F, Grifulvin V, Gris-PEG (Griseofulvin)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-griseofulvin/article_em.htm.

16     Spider veins are "smaller, red, purple, and blue vessels that . . . twist and turn."  Spider veins "can cause uncomfortable feelings in the legs," such as "itching or burning."  *Varicose Veins and Spider Veins Fact Sheet*, WOMENSHEALTH.GOV, http://www.womenshealth.gov/publications/our-publications/fact-sheet/varicose-spider-veins.cfm.

17     "The section of the spine that makes up the low back is called the *lumbar spine*."  *Lumbar Spine Anatomy*, ORTHOPOD, http://www.eorthopod.com/content/lumbar-spine-anatomy.

revealed interspace narrowing at L5-S1, mild rotatory scoliosis,[18] and the suggestion of spinal

stenosis at L4-5 and L5-S1.[19]  R. 264, 285.

On May 23, 2005 Rodriguez visited Dr. Jeffrey V. Lucido, D.P.M., a podiatrist,

and presented with heel pain unrelated to a trauma.  R. 233.  Dr. Lucido reported that the

examination indicated "pain to palpation of plantar-medial heel extending distally along plantar

aspect of foot left."  R. 233.  He indicated that Rodriguez had an antalgic gait bilateral,[20] and that

rotational movement of the left ankle revealed decreased dorsiflexion.[21]  R. 234-34.  Foot and

ankle x-rays taken that day revealed calcaneal spurs[22] and plantar fasciitis[23] bilaterally.  R. 234.

Dr. Lucido prescribed Mobic[24] and instructed Rodriguez to undertake home rotational movement

and Achilles tendon stretching exercises.  R. 234.

On April 4, 2005 Rodriguez visited Dr. Hasan, who continued her prescriptions of

Glucotrol, Avapro and ECASA, and also prescribed Glucophage,[25] Norco[26] and Ultracet.[27]  R.

---

18      Scoliosis is "an abnormal curvature of the spine."  Symptoms may include back pain.  *Scoliosis Causes, Symptoms, Treatment*, EMEDICINEHEALTH, http://www.emedicinehealth.com/scoliosis/article_em.htm#scoliosis_overview.

19      Spinal stenosis is "the narrowing of spaces in the spine (backbone) which causes pressure on the spinal cord and/or nerves."  Its symptoms may include low back pain as well as pain in the legs.  *Spinal Stenosis Causes, Symptoms, Treatments, Diagnosis*, WEBMD, http://www.webmd.com/back-pain/guide/spinal-stenosis.

20      An antalgic gait is "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side."  *Antalgic Gait*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=35907.

21      Dorsiflexion is the "[u]pward movement (extension) of the foot or toes."  *Dorsiflexion*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php.

22      A calcaneal spur is "[a] bony spur, also known as a heel spur, that projects from the back or underside of the heel bone (the calcaneus) and that may make walking painful."  Calcaneal spurs "cause tenderness and pain at the back of the heel."  *Calcaneal Spur Definition*, EMEDICINEHEALTH, http://www.emedicinehealth.com/script/main/art.asp?articlekey=7095.

23      Plantar fasciitis is the inflammation of the plantar fascia, which is a strip of fibrous tissue "stretching from the heel to the front of the bottom of the foot."  Symptoms include "pain and tenderness of the bottom (sole) of the foot," which "can lead to difficulty in weight-bearing on the involved food, making it difficult to walk, especially the first steps after awakening from sleep."  *Plantar Fasciitis Causes, Symptoms, Treatment*, EMEDICINEHEALTH, http://www.emedicinehealth.com/plantar_fasciitis/article_em.htm#plantar_fasciitis_overview.

24      Mobic is used to treat arthritis and reduces pain, swelling, and stiffness of the joints.  *Mobic Oral*, WEBMD, http://www.webmd.com/drugs/drug-18173-Mobic+Oral.aspx?drugid=18173&drugname=Mobic+Oral&source=1.

25      Glucophage is an oral diabetes medicine that helps control blood sugar levels for individuals with type 2 diabetes.  *Fortamet, Glucophage, Glucophage XR, Glumetza, Riomet (Metformin)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-metformin/article_em.htm.

173.  On April 25, 2005 Rodriguez returned to Dr. Hasan complaining of severe pain in her

lower back.  R. 174.  Dr. Hasan reported that Rodriguez was experiencing muscle spasms in her

lower back..  R. 174.  He continued her prescriptions of Glucotrol, Glucophage, Avapro and

Norco.[28]  R. 174.

On June 1, 2005 Rodriguez visited Dr. Hasan and again complained of back pain.

R. 175.  Dr. Hasan ordered a lumbar spine MRI and dual-energy x-ray absorptiometry

("DEXA") scan.[29]  R. 175, 237, 239-40.  He also continued her prescriptions of Norco,

Griseofulvin, and Lotrisone.  R. 175.  On June 24, 2005 Rodriguez returned to Dr. Hasan

complaining of swelling in both legs.  R. 176.

On June 27, 2005 the DEXA scan revealed no evidence of osteoporosis in the left

hip, lumbosacral spine, or left forearm.  R. 242.  The lumbar spine MRI, taken on the same day,

revealed: a L5-S1 central herniated disc abutting the thecal sac[30] and the right S1 nerve root but

without significant stenosis or nerve root impingement; L4-5 small disc bulge with facet

hypertrophy but without significant stenosis; and levoscoliosis of the lumbar spine.  R. 283.

---

26      Norco is a combination medication (hydrocodone and acetaminophen) that is used to relieve moderate to severe pain.  *Norco Oral*, WEBMD, http://www.webmd.com/drugs/drug-63-Norco+Oral.aspx?drugid=63&drugname=Norco+Oral&source=1.

27      Ultracet is a combination medication (tramadol and acetaminophen) that is used to treat moderate to severe pain.  *Ultracet (Acetaminophen and Tramadol)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-acetaminophen_and_tramadol/article_em.htm. The Commissioner claims that Dr. Hasan also prescribed Glucophage. Def. Mot. J. Pleadings 5.  While it does appear from Dr. Hasan's notes that he prescribed an additional medication, I cannot make out what that medication is from his handwriting.  R. 173.

28      Dr. Hasan appears to have prescribed one additional medication, but I could not make out what that was based on his handwriting.  R. 174.

29      A DEXA scan measures bone mineral density.  *DEXA Scan to Measure Bone Density*, WEBMD, http://www.webmd.com/osteoporosis/guide/dexa-scan.

30      "[I]n the lumbar spine there is no spinal cord.  Instead, the nerve roots hang like a 'horse[']s tail' in an enclosed . . . sac called the Thecal Sac."  Douglas M. Gillard, *Disc Anatomy*, CHIROGEEK.COM, http://www.chirogeek.com/000_disc_anatomy.htm.

9

On May 26, 2006 Rodriguez visited Dr. Hasan and complained about severe back pain.[31]  R. 179.  Dr. Hasan ordered a bilateral lower extremity venous duplex study.  R. 179.  On June 14, 2006 the study revealed no evidence of deep vein thrombosis.[32]

On July 19, 2006 Rodriguez visited Dr. Hasan to renew her prescriptions and to complain of bilateral ankle swelling.  R. 178.  Dr. Hasan referred Rodriguez to physical therapy for her back pain.  R. 262.  On August 14, 2006 Rodriguez returned to Dr. Hasan, who reported that she "has been having pain to lower back [for] awhile."  R. 180.  On August 28, 2006 Rodriguez returned to complain of continued bilateral ankle swelling, as well as pain.  R. 180.  Dr. Hasan ordered ankle x-rays.  R. 181, 265.  The x-rays, which were taken on September 7, 2006, revealed small bilateral plantar calcaneal spurs.  R. 268.

On September 5, 2006 Rodriguez visited Dr. Hasan and complained again of pain in her lower back as well as in both knees. R. 181.  On September 25, 2006 Rodriguez visited Dr. Salvatore Sclafani, an orthopedic surgeon, on a referral from Dr. Hasan.  R. 333.  Rodriguez complained of pain in her right knee as well as low back pain; Dr. Sclafani addressed only Rodriguez's knee pain.[33]  R. 333.  Dr. Sclafani reported that knee x-rays revealed mild arthritic changes.  R. 333.  He observed no effusion or instability.[34]  R. 333.  He diagnosed Rodriguez with synovitis,[35] mild osteoarthritis in the right knee, obesity, and low back pain.  R. 333.  He

---

31      Rodriguez visited Dr. Hasan about a half dozen times between June 2005 and May 2006.  R. 176-77, 179, 182-83.  The progress notes for these visits are difficult to make out due to the illegibility of Dr. Hasan's handwriting; they also appear out of order in the administrative record.  On at least one occasion – on October 3, 2005 – Rodriguez complained of having "pain to the lower back and body [for] awhile.  R. 183.

32      Deep vein thrombosis is a blood clot in a deep vein.  *Deep Vein Thrombosis*, EMEDICINEHEALTH, http://www.emedicinehealth.com/deep_vein_thrombosis-health/article_em.htm#Topic%20Overview.

33      Dr. Sclafani indicated that Dr. Hasan had only referred Rodriguez for her knee.

34      Effusion is "[t]he escape of fluid from the blood vessels or lymphatics into the tissues or a cavity." *Effusion*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=28077.

35      Synovitis is the "[i]nflammation of a synovial membrane, especially that of a joint."  *Synovitis*, EMEDICINEHEALTH, http://www.medilexicon.com/medicaldictionary.php?t=89127.

administered a cortisone injection[36] and recommended that Rodriguez receive authorization for treatment to her lower back.  R. 333.

On October 16, 2006 Rodriguez returned to Dr. Sclafani, complaining of low back pain when standing for prolonged periods of time or lifting.  R. 334.  She reported that she had been attending physical therapy.  R. 334.  On examination, Dr. Sclafani observed Rodriguez was "somewhat obese" and had tenderness in her lumbar area.  R. 334.  He reported that x-rays revealed mild scoliosis in the lower lumbar spine with mile osteoarthritic changes.  R. 334.  He diagnosed Rodriguez with osteoarthritis, scoliosis of the lumbar spine, and a possible herniated disc.  R. 334.  He administered a cortisone injection and recommended that Rodriguez continue physical therapy.  R. 334.

On October 20, 2006 Rodriguez visited Dr. Hasan and complained of having "back pain and difficulty walking [for] awhile."  R. 185.  On examination, Dr. Hasan reported tenderness and muscle spasms in Rodriguez's lower back.  R. 185.

On February 15, 2007 Rodriguez visited Dr. Hasan and complained of pain in her right shoulder following a fall.  R. 184.  Dr. Hasan referred Rodriguez to an orthopedist.  R. 184, 274.  On March 9, 2007 Rodriguez returned to Dr. Hasan and continued to complain of pain in her right shoulder, as well as her lower back.  R. 184.  On March 27, 2007 Rodriguez again referred Rodriguez to Dr. Sclafani for her shoulder pain.  R. 27677.

On April 16, 2007 Rodriguez visited Dr. Sclafani, complaining of "severe right shoulder pain of 2-week duration."  R. 281.  Dr. Sclafani reported tenderness and a positive

---

36      Cortisone is one type of corticosteroid, which reduces inflammation.  Cortisone injections can be used to treat the inflammation of small areas of the body, such as a tendon or joint.  *Cortisone Injection (Corticosteroid Injection)*, WEBMD, http://arthritis.webmd.com/cortisone-injection-soft-tissues-joints.

impingement sign with full motion.[37]  R. 281.  Shoulder x-rays revealed no significant bone or joint abnormalities.  R. 281.  Dr. Sclafani diagnosed Rodriguez with impingement syndrome and bursitis of the right shoulder.[38]  R. 281.  He administered Depo-Medrol[39] and Carbocaine injections.  R. 282.

Rodriguez continued to visit Dr. Hasan approximately once a month from April 2007 to February 2009.  R. 187-215.  She consistently complained of pain in her back.  R. 187-215.  Dr. Hasan reported that this pain was, at times, "severe."  R. 188, 196, 198, 200, 203-06, 209, 213.  His notes also indicate that the pain appeared to be worsening over time.  R. 190, 198-200, 203-09, 211, 213.  Dr. Hasan consistently reported detecting tenderness and muscle spasms in Rodriguez's lower back.  R. 187-88, 190, 192, 194-96, 198-200, 203-09, 211, 213-15.  In July 2007, Rodriguez also began complaining intermittently of pain in her legs, sometimes as radiating down from her back.  R. 189-90, 194, 199, 203, 209, 211, 213.

On February 15, 2009 Rodriguez went to the emergency room of Staten Island University Hospital complaining of left lower leg pain over the past week.  R. 162, 164.  She reported pain with standing and walking and explained that she spent all day on her feet as a cashier.  R. 164.  An examination revealed tenderness in the left calf and an antalgic gait.  R. 165.  A lower extremity ultrasound came back negative.  R. 165.

---

37      An impingement sign refers to pain associated with "rotator cuff tendinitis or tears within the subacromial space elicited by provocative physical examination maneuvers."  *Impingement Sign*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=81946.

38      Bursitis is "inflammation of a bursa."  *Bursitis*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=13050.  A bursa is a "closed sac . . . usually found or formed in areas subject to friction (over an exposed or prominent body part or where a tendon passes over a bone.")  *Bursa*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=12882.

39      A Depo-Medrol injection is used to treat pain and swelling that occurs with arthritis and other joint disorders.  *Depo-Medrol Inj*, WEBMD, http://www.webmd.com/drugs/drug-6160-Depo-Medrol+Inj.aspx?drugid=6160&drugname=Depo-Medrol+Inj.  Carbocaine is a local anesthetic.  *Carbocaine, Carbocaine HCI, Polocaine, Polocaine-MPF (Mepivacaine)*, EMEDICINEHEALTH, http://www.emedicinehealth.com/drug-mepivacaine/article_em.htm.

On February 28, 2009 Rodriguez visited Dr. Hasan.  R. 216.  She complained of pain in her left knee and reported difficulty walking.  R. 216.  Dr. Hasan reported tenderness in Rodriguez's left knee and a decreased range of motion.  R. 216.  He diagnosed Rodriguez with left knee pain and possible osteoarthritis.  R. 216.  He prescribed Norco and ordered a left knee MRI.  R. 216.

On March 4, 2009 Rodriguez returned to Dr. Hasan.  R. 219.  Rodriguez complained of low back pain, which radiated down to the back of her thighs.  R. 219.  She also reported a tingling sensation in both legs.[40]  R. 219.

### 2.   *2009-2012:  Medical Evidence after the Alleged Onset Date*

On March 11, 2009 Rodriguez underwent an MRI of her left knee.  R. 167.  The MRI revealed a torn medial meniscus,[41] a suspected tear of the anterior horn of the lateral meniscus, and chondromalacia involving the trochlea.[42]

On April 8, 2009 Rodriguez visited Dr. Hasan and complained of back pain and bilateral knee pain.  R. 218.  She also reported difficulty walking.  R. 218.  On examination, Dr. Hasan reported tenderness in both knees and a decreased range of motion.  R. 218.  He also reported tenderness, muscle spasms, and a decreased range of motion in her lower back.  R. 218.

---

40      The administrative record contains two progress notes from Dr. Hasan on this date.  The other note reports that Rodriguez felt "a little better," and had returned for her lab work results and to have her "job paper[s]" filled out.  R. 217.

41      A meniscus tear "damages the rubbery cushion of the knee joint," which is made up of "two disks, which are called the medial meniscus and the lateral meniscus."  *Meniscus Tear*, WEBMD, http://www.webmd.com/hw-popup/meniscus-tear.

42      Chondromalacia refers to the softening of cartilage.  *Chondromalacia*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=17189.  A trochlea is "[a] smooth articular surface of bone upon which another glides."  *Trochlea*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=94121.

Dr. Hasan diagnosed Rodriguez with low back pain, diabetes, and hyperlipidemia.[43]  R. 218.  He prescribed Norco, Glucovance, and Crestor.  R. 218.

On the same day, Dr. Hasan completed a functional capacity questionnaire.  R. 168.  He diagnosed Rodriguez with diabetes, pain in the knee joints and back, and osteoarthritis.  R. 168.  He reported that these impairments have lasted or could be expected to last at least twelve months.  R. 168.  He indicated that in an eight-hour day, Rodriguez could stand or walk up to two hours and sit up to two hours.  R. 168.  He further indicated that she could not lift or carry any weight and could neither stoop nor crouch.  R. 168.  He reported that Rodriguez could occasionally handle items, and could frequently finger and grasp items.  R. 168.  He indicated that Rodriguez's pain was severe enough to frequently interfere with the attention and concentration needed to perform simple work tasks.  R. 168.  He further indicated that Rodriguez's impairments would cause her to be absent from work about four days per month.  R. 168.  Finally, Dr. Hasan identified a positive straight leg raising test, impaired sleep, a prescribed cane, depression, and a reduced range of motion as among the signs and symptoms supporting his assessment.  R. 168.

On April 30, 2009 Rodriguez visited Dr. Hasan, who reported tenderness, muscle spasms, and a reduced range of motion in her lower back.  R. 219.  He diagnosed Rodriguez with low back pain and tenia cruris (crotch itch).  R. 219.  He prescribed Norco, Lyrica, and Lotrisone cream.  R. 219.

On the same day, Dr. Hasan completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Diabetes."  R. 358-62.  He identified diagnoses of diabetes, back pain, and osteoarthritis.  R. 358.  He indicated that Rodriguez exhibited symptoms

---

43      Hyperlipidemia refers to "[e]levated levels of lipids in the blood plasma." *Hyperlipidemia*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=42421.

of fatigue, difficulty walking, bladder infections, excessive thirst, general malaise, muscle weakness, vascular disease/leg cramping, and frequency of urination.  R. 358.  He further indicated that these impairments had lasted or could be expected to last at least twelve months. R. 358.  He reported that depression affected Rodriguez's physical conditions.  R. 358.

Dr. Hasan indicated that Rodriguez's pain was severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks.  R. 359.  He indicated that she was capable of low stress jobs.  R. 359.  He estimated that Rodriguez could walk one city block without rest or severe pain and that she could sit or stand for fifteen minutes at a time.  R. 359.  In an eight-hour day, he estimated that she could sit for less than two hours and stand or walk for less than two hours.  R. 359.  He indicated that Rodriguez must be able to sit, stand, and walk at will, that she would need to take unscheduled breaks to lie down for a half hour "most of the time," and that she would need ten-minute periods of walking around approximately every ten minutes throughout an eight-hour day.  R. 360.  He indicated that Rodriguez would need a cane or other assistive device for occasional standing or walking.  R. 360.  Dr. Hasan indicated that Rodriguez could frequently lift and carry less than ten pounds, but never lift more than that weight, and that she would have significant limitations "in doing repetitive reaching, handling or fingering."  R. 360-61.  He indicated that she could never stoop, crouch/squat, or climb ladders or stairs and that she could rarely twist.  R. 360.  Finally, Dr. Hasan estimated that Rodriguez was likely to be absent from work more than four days per month as a result of her impairments.  R. 361.

On May 26, 2009 Dr. Hasan prescribed a cane for Rodriguez.  R. 325.

On June 1, 2009 Rodriguez visited Dr. Sclafani on a referral from Dr. Hasan.  R. 322, 330.  Rodriguez complained of pain in her left knee for the past two months.  R. 330.  Dr.

Sclafani reported mild effusion and mild crepitus.[44]  R. 330.  He also reported that the medial

joint line was tender to palpation, and that Rodriguez had a positive McMurray test.[45]  R. 330.

He noted that the March 11, 2009 MRI indicated a medial meniscal tear and chondromalacia.  R.

330.  He diagnosed Rodriguez with a torn medial meniscus and chondromalacia.  R. 330.  He

discussed the risks and benefits of arthroscopy versus conservative treatment.  R. 330.

Rodriguez opted for conservative treatment, and Dr. Sclafani recommended a course of physical

therapy.  R. 330.

On June 8, 2009 Dr. Chitoor Govindaraj conducted a consultative examination of

Rodriguez.  R. 337-39.  According to Dr. Govindaraj, Rodriguez indicated that she had worked

as a cashier until March 2009 and that she had stopped working due to low back pain and a torn

medial meniscus and arthritis in the left knee. R. 337.  He also indicated that she has a history of

diabetes.  R. 337.  Dr. Govindaraj reported that Rodriguez saw Dr. Sclafani for her knee and

back, that an MRI revealed a medial meniscus tear, and that she was advised to undergo

rehabilitation without medication.  R. 337.  Dr. Govindaraj indicated that Rodriguez's current

medications include Metformin, Hydrocodone, and Lyrica.  R. 337-38.  He also reported that

Rodriguez had been losing weight, from 265 to 236 pounds, and was "[v]ery active with

walking."  R. 338.

On examination, Dr. Govindaraj reported that Rodriguez was able to bend down

and touch the floor and that the range of motion of her spine and back was within normal limits.

R. 338-39.  He reported that there was no evidence of muscle spasms.  R. 339.  He indicated that

---

44    Crepitus is a clinical sign "characterized by a peculiar cracking, crinkly, or grating feeling or
sound . . . in the joints."  Crepitus in a joint "can indicate cartilage wear in the joint space."  *Crepitus Definition*,
EMEDICINEHEALTH, http://www.emedicinehealth.com/script/main/art.asp?articlekey=12061.

45    A McMurray Test is a "rotation of the tibia on the femur to determine injury to meniscal
structures."  *McMurray Test*, MEDILEXICON, http://www.medilexicon.com/medicaldictionary.php?t=90652. A
positive test indicates meniscal injury.  *McMurray Test*, AMERICAN HERITAGE MEDICAL DICTIONARY,
http://medical-dictionary.thefreedictionary.com/McMurray+test.

there was minimal crepitation in the left knee, but that the range of motion of all the joints was within normal limits.  R. 339.  He reported that the straight leg raising test was negative.  R. 339.  He indicated that Rodriguez's gait was "normal with more weightbearing on the right side," that posture was normal, and that a cane was not needed.  R. 339.  Lumbar spine x-rays of Rodriguez revealed that Rodriguez had mild degenerative changes and mild lumbar curvature.  R. 340.  Left knee x-rays revealed small suprapatellar effusion.  R. 340.  Dr. Govindaraj found Rodriguez stable for her occupation, and diagnosed her with a history of diabetes, obesity, left knee and lumbar degenerative joint disease, and a medial meniscus tear.  R. 339.

On August 3, 2009 Dr. Hasan again prescribed a cane for Rodriguez.  R. 158.

On August 12, 2009 Rodriguez visited Dr. Joseph Giovinazzo on a referral from Dr. Hasan for an evaluation of her left knee.  R. 363.  Rodriguez indicated that her knee had been hurting since February 2009.  R. 363.  She indicated that physical therapy and medicine had not been successful.  R. 363.  She reported pain in the medial aspect and difficulty with climbing stairs, having to climb them one at a time.  R. 363.  She weighed 242 pounds.  R. 363.

Dr. Giovinazzo reported that Rodriguez had a positive McMurray test and exhibited tenderness over the anterior horn of the lateral knee.  R. 363.  He reported that x-rays revealed slightly decreased joint space on the left knee versus the right knee with some possible spurring along the medial plateau, but no loose bodies.  R. 363.  He scheduled an arthroscopy for September 2009 after discussing operative and non-operative treatments with Rodriguez.  R. 363.

On September 24, 2009 Rodriguez visited Dr. Hasan and complained of "severe low back pain" radiating "to the back of both thighs."  R. 367.  She also reported left knee pain aggravated by any activity and difficulty walking.  R. 367.

17

On September 29, 2009 Dr. Giovinazzo performed arthroscopic surgery on Rodriguez's left knee.  R. 365.

On September 30, 2009 Dr. Hasan completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Diabetes."  R. 353-57.  He diagnosed Rodriguez with diabetes, low back pain, osteoarthritis, and peripheral neuropathy.[46]  R. 353.  He indicated that Rodriguez exhibited symptoms of fatigue, difficulty walking, episodic vision blurriness, swelling, muscle weakness, vascular disease/leg cramping, extremity pain and numbness, frequency of urination, headaches, limited vision, and difficulty hearing.  R. 353.  He reported as clinical findings persistent low back pain, numbness to toes, and extreme fatigue.  R. 353.  He indicated that these impairments had lasted or could be expected to last at least twelve months.  R. 353.  He reported that depression affected Rodriguez's physical conditions.  R. 353.

Dr. Hasan indicated that Rodriguez's pain was severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks.  R. 354.  He indicated that she was capable of low stress jobs.  R. 354.  He estimated that Rodriguez could walk one city block without rest or severe pain and that she could sit for ten minutes and stand for five minutes at a time.  R. 354.  In an eight-hour day, he estimated that she could sit for less than two hours and stand or walk for less than two hours.  R. 354.  He indicated that Rodriguez must be able to sit, stand, and walk at will, that she would need to take unscheduled breaks to lie down for a half hour every twenty minutes, and that she would need ten-minute periods of walking around approximately every ten minutes throughout an eight-hour day.  R. 355.  He indicated that Rodriguez would need a cane or other assistive device for occasional standing or

---

46      Peripheral neuropathy is "a problem that affects the peripheral nerves," which "control your sense of touch, how you feel pain and temperature, and your muscle strength."  Peripheral neuropathy causes pain and loss of feeling and may make it difficult to perform activities that require coordination.  *Peripheral Neuropathy*, EMEDICINEHEALTH, http://www.emedicinehealth.com/peripheral_neuropathy-health/article_em.htm.

walking.  R. 355.  Dr. Hasan indicated that Rodriguez could frequently lift and carry less than ten pounds, rarely lift ten pounds, and never lift more than that weight, and that she would have significant limitations "in doing repetitive reaching, handling or fingering."  R. 355-56.  He indicated that she could never crouch/squat, or climb ladders, and that she could rarely twist, stoop, or climb stairs.  R. 355.  Dr. Hasan estimated that Rodriguez was likely to be absent from work more than four days per month as a result of her impairments.  R. 361.  Additional limitations indicated on the form include a herniated disc and arthritis in the lower back, arthritis and a torn medial meniscus in the left knee, diabetes, and depression.  R. 356-57.

On October 7, 2009 Rodriguez saw Dr. Giovinazzo for a post-operative follow-up.  R. 366.  Dr. Giovinazzo reported that she had a negative Homans' sign[47] and no knee effusion.  R. 366.  He indicated that Rodriguez understood that she had arthritis in the knee.  He recommended weight loss and physical therapy.  R. 366.

Rodriguez visited Dr. Hasan on October 24, 2009, November 19, 2009, and December 19, 2009.  R. 369-74.  She consistently complained of severe low back pain that radiated to the back of both thighs.  R. 369, 371, 373.  She complained of general muscle pain, joint pain, stiffness, backache, and shoulder pain.  R. 369, 371, 373.  Dr. Rodriguez reported that Rodriguez had a good exercise tolerance and was able to do her usual activities.  R. 369, 371, 373.

On December 19, 2009 Dr. Hasan completed a "Medical Source Statement Concerning the Nature and Severity of an Individual's Lumbar Spine Impairment."  R. 387-90.  He diagnosed Rodriguez with diabetes, low back pain, osteoarthritis, and peripheral neuropathy.  R. 387.  He indicated that Rodriguez exhibited symptoms of persistent low back pain, numbness

---

47     Homan's sign is a test for detecting deep vein thrombosis.  *Homans' Sign*, MERRIAM-WEBSTER, http://www.merriam-webster.com/medical/homans%27%20sign.

to toes, and extreme fatigue; he also reported these symptoms as his clinical findings.  R. 387.

He further indicated that Rodriguez's low back pain was aggravated by any activity.  R. 387.  He

identified a positive straight leg raising test, ankle swelling, muscle spasms, tenderness, knee

crepitus, impaired sleep, and depression as the "positive objective signs" supporting his

assessment.  R. 387-88.  He indicated that these impairments had lasted or could be expected to

last at least twelve months.  R. 388.  He also indicated that the medications taken by Rodriguez

cause sleepiness.  R. 388.

　　　　　Dr. Hasan indicated that Rodriguez's pain was severe enough to constantly

interfere with the attention and concentration needed to perform simple work tasks.  R. 388.  He

estimated that Rodriguez could walk half a city block without rest or severe pain and that she

could sit for ten minutes and stand for five minutes at a time.  R. 388.  In an eight-hour day, he

estimated that she could sit for less than two hours and stand or walk for less than two hours.  R.

388.  He indicated that Rodriguez must be able to sit, stand, and walk at will, that she would

need to take unscheduled breaks for a half hour every twenty minutes, and that she would need

ten-minute periods of walking around approximately every ten minutes throughout an eight-hour

day.  R. 389.  He indicated that Rodriguez would need a cane or other assistive device for

occasional standing or walking.  R. 389.  Dr. Hasan indicated that Rodriguez could frequently lift

and carry less than ten pounds, rarely lift ten pounds, and never lift more than that weight, and

that she would have significant limitations "in doing repetitive reaching, handling or fingering."

R. 389-90.  He indicated that she could never crouch/squat, or climb ladders, and that she could

rarely stoop or climb stairs.  R. 389-90.  Dr. Hasan estimated that Rodriguez was likely to be

absent from work more than four days per month as a result of her impairments.  R. 361.

Additional limitations indicated on the form include numbness in both legs and toes, a herniated

disc in the lower back, a torn medial meniscus, arthritis in the lower back and knees, and

depression.. R. 390.

Rodriguez continued to visit Dr. Hasan approximately once a month from January

2010 to December 2010.  R. 375-405.  She consistently complained of severe low back pain that

radiated to the back of both thighs.  R. 375, 377, 379, 381, 383, 393, 396, 399, 404.  She also

complained of left knee pain aggravated by any activity and difficulty walking.  R. 375, 377,

379, 381, 383, 393, 396, 399, 404.

DISCUSSION

A.      *The Legal Standard*

Under the Social Security Act, Rodriguez is entitled to disability benefits if, "by

reason of any medically determinable physical or mental impairment which . . . has lasted or can

be expected to last for a continuous period of not less than 12 months," 42 U.S.C. §

423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her]

age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy," *id*. § 423(d)(2)(A).

The Social Security Administration's regulations prescribe a five-step analysis for

determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  If [s]he is not, the
> Commissioner next considers whether the claimant has a severe
> impairment which significantly limits [her] physical or mental
> ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the Commissioner will consider [her] disabled without
> considering vocational factors such as age, education, and work
> experience; the Commissioner presumes that a claimant who is
> afflicted with a listed impairment is unable to perform substantial

21

> gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, [s]he has the residual functional capacity to
> perform [her] past work.  Finally, if the claimant is unable to
> perform [her] past work, the Commissioner then determines
> whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks and alterations omitted) (quoting

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v)

(setting forth this process).  The claimant bears the burden of proof in the first four steps, the

Commissioner in the last.  *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

The Commissioner decides whether the claimant is disabled within the meaning of

the Act.  20 C.F.R. § 404.1527(e)(1).  Under 42 U.S.C. § 405(g), I review the Commissioner's

decision to determine whether the correct legal standards were applied, and whether the decision

is supported by substantial evidence.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).   If

the record contains evidence which "a reasonable mind might accept as adequate to support [the

Commissioner's] conclusion," this Court may not "substitute its own judgment for that of the

[Commissioner] even if it might justifiably have reached a different result upon a *de novo*

review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quotation marks omitted).

B.      *The ALJ's Rejection of Rodriguez's Disability Claims*

The ALJ followed the five-step procedure outlined above for determining whether

Rodriguez was disabled within the meaning of the Social Security Act.  He determined, first, that

Rodriguez had not engaged in substantial gainful activity since March 9, 2009.  R. 9.  The ALJ

then determined that Rodriguez was afflicted with severe impairments: status post left knee

arthroscopy, diabetes mellitus, polyneuropathy, and obesity.  R. 9.  He found these impairments

to be severe as they caused more than minimal functional limitations.  R. 9.  Under the third step

of the analysis, the ALJ found that Rodriguez's impairments did not meet or medically equal one

of the impairments listed in 20 C.F.R. Part 303, Subpart P, Appendix I.  R. 9 (citing 20 C.F.R. §§ 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  In particular, the ALJ found that while Rodriguez "was prescribed a cane to assist with ambulation, she does not display an inability to ambulate effectively within the meaning of 1.02A and 1.03."[48]  R. 9 (internal citation omitted).

---

[48]     1.02A is:

Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.   Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.

1.03 is:

Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively . . . and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

*Id.*

An "inability to ambulate effectively" means

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.*  To ambulate effectively,

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

23

The ALJ then determined that Rodriguez had the RFC to perform the full range of sedentary work, which involves lifting or carrying ten pounds occasionally, sitting six hours, and standing or walking two hours out of an eight-hour work day.  R. 9 (citing 20 C.F.R. §§ 404.1567(a), 416.967(a)).  In arriving at this determination, the ALJ considered Rodriguez's testimony as well as her medical records, which he summarized in his written opinion.  R. 10-11.  The ALJ explained that he did not find Rodriguez's testimony concerning the intensity, persistence, and limiting effects of her symptoms credible to the extent the testimony was "inconsistent with the above RFC assessment."  R. 10.  With respect to her left knee, the ALJ noted that the consultative examination with Dr. Govindaraj indicated a normal range of motion in all joints and minimal crepitation.  R. 11.  He also noted that post-operative notes for Rodriguez's arthroscopy indicated that she had arthritis in the left knee, but a negative Homans' sign and no effusion.  R. 11.  With respect to her back, the ALJ observed that a June 2009 lumbar x-ray revealed only mild degenerative lumbar changes and that the consultative examination by Dr. Govindaraj indicated a normal range of spinal motion.  R. 11.  Finally, with respect to her obesity, the ALJ observed that the consultative examination with Dr. Govindaraj indicated that she was losing weight and "very active with walking."  R. 11.

The ALJ further suggested there were internal inconsistencies in Rodriguez's testimony.  R. 11.  He noted that Rodriguez is "essentially independent in personal care."  R. 11.  He specifically observed that Rodriguez "prepares meals daily, which takes 45 minutes to 1 ½ hours" and that "[s]he can do some household chores with assistance, and shops for groceries."  R. 11.

In considering Rodriguez's medical records, the ALJ gave Dr. Govindaraj's medical opinion "great weight."  R. 11.  He discredited the medical opinion of Dr. Hasan,

*Id.*

Rodriguez's primary care physician.  R. 11.  He observed that Dr. Hasan's opinion that Rodriguez's ability to work "is significantly impaired due to pain and drowsiness" is inconsistent with his treatment notes, "which note only general pain."  R. 11.  He also observed that Rodriguez herself "may have added some information to said statements," rendering "questionable" the "validity of the statements."  R. 11.  Accordingly, the ALJ gave Dr. Hasan's medical opinion "little weight."  R. 11.

In the fourth step of the analysis, the ALJ concluded, on the basis of his RFC determination, that Rodriguez was unable to perform her past relevant work as a cashier.  R. 11.  Moving on to the fifth and final step, the ALJ found that considering Rodriguez's age, education, work experience, and RFC, she was able to perform jobs existing in significant numbers in the national economy.  R. 12.  In arriving at this conclusion, the ALJ considered Rodriguez's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines. R. 12 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2).  Specifically, he found that Medical-Vocational Rule 201.21 directed that a 46-year old individual[49] with at least a high school education, English language skills, and an RFC for the full range of sedentary work is "not disabled."  R. 12.  Accordingly, the ALJ concluded that Rodriguez was not disabled within the meaning of the Social Security Act.  R. 12.

C.    *Analysis of the ALJ's Decision*

1.  *The Treating Physician Rule*

Under the treating physician rule set out in 20 C.F.R. § 404.1527(d), a treating physician's opinion about the nature and severity of a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

---

[49]    Rodriguez was 46 years old at the time of the alleged onset of her disability.

record."  20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 536, 568 (2d Cir.

1993) (upholding regulations).  The Commissioner must set forth "good reasons" for refusing to

accord the opinions of a treating physician controlling weight.  *Snell v. Apfel*, 177 F.3d 128, 133

(2d Cir. 1999).  He must also give "good reasons" for the weight actually given to those opinions

if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran v.*

*Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s

opinion and we will continue remanding when we encounter opinions from ALJs that do not

comprehensively set forth reasons for the weight assigned to a treating physician's opinion.");

*Snell*, 177 F.3d at 133 ("Under the applicable regulations, the Social Security Administration is

required to explain the weight it gives to the opinions of a treating physician.").  If it is not given

controlling weight, the weight given to a treating physician's opinion must be determined by

reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment

relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the

record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."

*Schall v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

   The regulations define "treating source" as a claimant's "own physician,

psychologist, or other acceptable medical source who provides [a claimant] . . . with medical

treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the

claimant]."  20 C.F.R. § 404.1502.  There is no dispute that Dr. Hasan was Rodriguez's primary

treating physician during the period of alleged disability.  Dr. Hasan treated Rodriguez on a

monthly basis over the course of nearly six years, from 2005 to 2010.

On multiple occasions, Dr. Hasan opined that Rodriguez's impairments were severe enough to interfere with her ability to perform simple work tasks.  R. 168, 354, 359, 388.  In particular, Dr. Hasan regularly opined that Rodriguez would be unable to sit for six hours in an eight-hour day, one of the criteria for an RFC assessment that an individual can perform the full range of sedentary work.  On April 8, 2009, Dr. Hasan completed a functional capacity questionnaire, in which he indicated that in an eight-hour day, Rodriguez could only sit up to two hours.  R. 168.  And on April 30, 2009, September 30, 2009, and December 19, 2009, he completed medical source statements, in which he indicated that she could sit for less than two hours in an eight-hour day.  R. 354, 359, 388.  He further indicated in these reports that she would be able to sit for only about ten to fifteen minutes at a time and would need to take unscheduled breaks either to lie down or walk around.  R. 354-55, 359-60, 388-89.

The ALJ elected to give Dr. Hasan's medical source statements "little weight."  R. 11.  In support of that assessment, the ALJ stated that Dr. Hasan's opinion that "the claimant's ability to work is significantly impaired due to pain and drowsiness" is "inconsistent with his treatment notes, which note only general pain."  R. 11.  The ALJ further observed that "it appears that the claimant may have added some information to said statements," rendering "the validity of the statements . . . questionable."  R. 11.

The ALJ failed to provide "good reasons" for refusing to accord Dr. Hasan's opinions controlling weight.  His first reason – that Dr. Hasan's opinion that Rodriguez's "ability to work is significantly impaired due to pain and drowsiness" is "inconsistent with his treatment notes, which note only general pain" – makes little sense.  R. 11.  The ALJ does not elaborate on what he means by "general pain," and how a notation of "general pain" is in any way

inconsistent with more specific descriptions of pain.[50]  Moreover, this reasoning is belied by the treatment notes, from 2005 to 2010, which record that Rodriguez suffered from pain, at times "severe," in her lower back.  *See, e.g.* R. 188, 196, 198, 200, 203-06, 209, 213, 367, 375, 393, 404.  The treatment notes also record that this pain began radiating down to her legs in July 2007, *see, e.g.*, R. 189-90, 194, 199, 203, 209, 211, 213, 367, 375, 393, 404, as well as the onset of pain in her left knee in February 2009, which affected her ability to walk, *see, e.g.* R. 216, 218, 367, 375, 393, 404.  Dr. Hasan continued to note pain in Rodriguez's left knee, even after her arthroscopy in September 2009.  R. 369, 371, 373, 375, 377, 379, 381, 383, 393, 396, 399, 404.

The ALJ's second reason for discrediting Dr. Hasan's medical source statements is that Rodriguez appears to have added some information to these statements, throwing into question their validity.  R. 11.  As an initial matter, the ALJ discounts all of Dr. Hasan's statements, despite evidence that only two of them (the ones dated September 30, 2009 and December 19, 2009) contain Rodriguez's handwriting.  R. 11.  Accordingly, with respect to at least the April 8, 2009 functional capacity questionnaire and April 30, 2009 medical source statement, the statement that Rodriguez "may have added some information to some statements" does not constitute a "good reason[ ]" for affording them "little weight."  As for the September 30, 2009 and December 19, 2009 statements, Rodriguez's handwriting is limited to two discrete portions of those statements.  First, in the September 30, 2009 statement, Rodriguez appears to have written in two additional symptoms ( limited vision and difficulty hearing) and described additional limitations affecting her ability to work( herniated disc in lower back, torn medial

---

[50]     To the extent the ALJ was referring to the fact that the treatment notes fail to note drowsiness, this argument is no less convincing.  In fact, it misconstrues the medical source statements submitted by Dr. Hasan, which consistently note that it is pain, not drowsiness, that impairs Rodriguez's ability to work.  R. 168, 353, 358, 387.  The only mention of drowsiness is in the December 19, 2009 medical source statement, in which Dr. Hasan notes that a side effect of Rodriguez's medications is sleepiness, which may also impair her ability to work.  R. 388.

meniscus in left knee, arthritis in lower back and knee, diabetes, depression, and difficulty walking for long periods of time).  R. 353, 356-57.  Similarly, in the December 19, 2009 statement, Rodriguez appears to have written in the additional symptom of depression and described additional limitations affecting her ability to work ( herniated disc in lower back, torn medial meniscus in left knee, arthritis in lower back and knee, numbness in legs and toes, diabetes, depression, and difficulty walking).  R. 388, 390.  But Dr. Hasan's handwriting appears throughout the remainder of both statements;  moreover, the information provided by Dr. Hasan in those portions of the statements is consistent with that provided in the prior statements.  In addition, the information supplied by Rodriguez largely parrots the medical diagnoses that she had consistently received over the course of treatment from Dr. Hasan.  For these reasons, I find that this second reason is not a "good reason[ ]" for affording Dr. Hasan's medical statements little weight.

   The ALJ further suggested that the medical evidence of record does not support Dr. Hasan's opinion.  Rather, he accorded Dr. Govindaraj's opinion "great weight," finding his conclusion that Rodriguez was "stable for occupation" to be "consistent with the medical evidence of record."  R. 11.  This conclusion is  baffling given that Dr. Govindaraj seems to be referring to Rodriguez's "occupation" as a cashier, and the ALJ himself found that Rodriguez's "past relevant work as a cashier . . . entails job activities that exceed her current residual function capacity."  R. 12.  It is further baffling given that it conflicts sharply with the medical evidence in the record.  In particular, it conflicts with medical evidence that Rodriguez had a medial meniscus tear in her left knee at the time of her consultative examination, a diagnosis Dr. Govindaraj included in his medical source statement.[51]  R. 339.

---

[51]  Dr. Govindaraj also noted that Rodriguez was "[v]ery active with walking," R. 338, a finding the ALJ repeatedly emphasized in his opinion.  R. 11.  But again this statement is very much at odds with the medical

By according "great weight" to Dr. Govindaraj's opinion, the ALJ ignored the evidence on the record that supported Dr. Hasan's opinion.  Moreover, he disregarded his obligations to  make "every reasonable effort" to understand the bases of Dr. Hasan's opinion, *see* SSR 96-5p, and to supplement the record, *see* § 404.1512(e)(1) (ALJ must "seek additional evidence or clarification from [claimant's] medical source when the report from [the] medical source . . . does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."); *Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999) ("[A] treating physician's 'failure to include this type of support for the findings in his report does not mean that such support does not exist . . . .'" (quoting *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998)).  Accordingly, the treating physician rule requires a remand for its proper application to Dr. Hasan's medical opinion.

2.  *Credibility*

An ALJ must take into account subjective complaints of pain in his disability analysis.  20 C.F.R. §§ 404.1529(a), (d), 416.929(a), (d).  If an ALJ rejects a claimant's testimony as not credible, the decision must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Crysler v. Astrue*, 563 F. Supp. 2d  418, 440 (N.D.N.Y. 2008).  In assessing credibility, the regulations require the ALJ to consider the following factors: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received;

---

evidence in the record.  This evidence includes the medial meniscus tear in Rodriguez's left knee and Dr. Sclafani's diagnosis of chondromalacia and report of mild effusion and mild crepitus in the knee in June 2009.  R. 330.

and (6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi),
416.929(c)(3)(i)-(vi).

   In her applications for benefits, Rodriguez indicated that she could not work
because she was unable to sit for longer than ten minutes and stand for longer than five minutes.
R. 105, 114.  Later, in a "Function Report" and "Pain Questionnaire," Rodriguez described the
pain as a "stabbing hard extreme pain" in her "left knee and behind the knee and the leg," that
also radiates to her lower back.  R. 137.  She indicated that the pain has gotten worse over time
and that she experiences it "all the time, everyday," and that "walking and standing sometimes
sitting" bring on the pain.  R. 138.  She claimed that she is limited to walking half a block and
then having to rest and needing assistance doing most chores.  R. 130, 132.  While she reported
preparing her own meals, she indicated that she has "to sit down sometimes, then get up and
continue cooking again."  R. 131.  At the hearing, Rodriguez testified that she experienced "pain
and discomfort" in her lower back and left knee and that she has "problems walking."  R. 23.
She indicated that she can stand for five minutes before having to sit down and that she can sit
comfortably for five minutes before having to stand up.  R. 25.  She reported difficulty with
activities of daily living, including dressing, tying her shoes, and getting in and out of the
bathtub.  R. 28-29.  She testified that she can do "light cooking" and cleaning, but that she
"get[s] tired at times" and "ha[s] to sit down and stop."  R. 26.  She also testified that she goes
grocery shopping, but that a neighbor or a friend will usually accompany her to assist.  R. 26.
She indicated that she would be unable to work a job where she was sitting down during the day.
R. 27.

   The ALJ found Rodriguez's statements to conflict with the opinion of Dr.
Govindaraj, particularly his observations that Rodriguez is "very active with walking" and that

31

she is "stable for occupation."  R. 11.  But as noted above, these statements both conflict with the

ALJ's own assessment that Rodriguez is incapable of working in her past occupation as a

cashier, as well as the medical evidence on record.  Moreover, the ALJ entirely ignored the

conflicting notations by Dr. Hasan that Rodriguez was consistently experiencing pain in her

lower back and left knee, which made it difficult for her to walk.  *See, e.g.* R. 216, 218, 367, 375,

393, 404.  Dr. Hasan's medical source statements further indicate that this pain prevented

Rodriguez from sitting for ten to fifteen minutes and standing for five to fifteen minutes at a

time.  R. 354, 359, 388.

   "While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of

medical testimony,' [s]he cannot simply selectively choose evidence in the record that supports

his conclusions."  *Gecevic v. Secretary of Health and Human Services*, 882 F. Supp. 278, 286

(E.D.N.Y. 1995) (quoting *Fiorella v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)) (citations

omitted).  Given the ALJ's duty to consider Rodriguez's account of her limitations against the

background of the full record, and his obligation to develop that record where necessary, the

ALJ's selective reading of the evidence was improper.  *Fuller v. Astrue*, No. 09-CV-6279, 2010

WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010) ("Essentially, the ALJ cherry-picked several

opinions that were supportive of her decision and disregarded the majority of the medical

evidence in the record including that of the treating physicians.  This type of selective analysis of

the record is improper.").

   In discrediting Rodriguez's description of the intensity, persistence, and limiting

effects of her impairments, the ALJ also suggested that there were inconsistencies in Rodriguez's

testimony.  In particular, he noted that Rodriguez "is essentially independent in personal care,"

as she "prepares meals daily, which takes 45 minutes to 1 ½ hours" and "can do some household

chores with assistance, and shops for groceries." R. 11.  But the ALJ failed to mention that Rodriguez also stated that she usually receives assistance when grocery shopping, R. 26, and often has to stop and rest while preparing simple meals.  R. 26, 131.  Regardless, I fail to see how these statements are irreconcilable with her statements that she experienced intense pain in her back and left knee that rendered her unable to sit or stand for prolonged periods of time.  On remand, the ALJ must assess Rodriguez's credibility according to the rubric established by the regulations and after a full development and examination of the record.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied and Rodriguez's motion is granted to the extent that the case is remanded to the Commission for further proceedings consistent with this decision.

So ordered.

John Gleeson, U.S.D.J.

Dated:  March 28, 2013
        Brooklyn, New York